M6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

| | |
|---|---|
| BRONWYN FORD,<br>    Plaintiff,<br><br>v.<br><br>CITY OF BOSTON, SUFFOLK COUNTY,<br>and RICHARD J. ROUSE, SHERIFF OF<br>SUFFOLK COUNTY<br>    Defendants. | Civ. No. 98-11346-NG |

GERTNER, D.J.

### MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT BY AND AGAINST PLAINTIFF FORD
July 31, 2001

Plaintiff Bronwyn Ford ("Ford") was arrested on a defective default warrant and subjected to two strip-searches and one visual body cavity search while in custody.[1] She challenges the constitutionality of these searches under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and under the Constitution and common-law of the Commonwealth of Massachusetts. In addition, she claims the defendants were deliberately indifferent to her medical needs while in custody, in violation of the Fourth, Eighth, and Fourteenth Amendments.

Ford moves for summary judgment against the City of Boston ("City") on her Fourth Amendment claim relating to the search at

---

[1] Ford opted out of the certified class of plaintiffs, but she continues to be a party to this action, and to pursue her individual claims against the defendants. This Memorandum only addresses Ford's individual claims. I address the claims of the plaintiff class in another Memorandum, also issued today.

DOCKETED

120

the Boston Police Department's ("BPD") Berkeley Street facility ("Berkeley Street lockup"), against Suffolk County ("County"), Richard Rouse ("Rouse"), and the City on her Fourth Amendment claims relating to the search at the Nashua Street Jail ("County Jail"), and against the City on her equal protection claim. The City cross-moves for summary judgment of all counts in which it is named (Counts I, IV, V, and VI), and the County and Sheriff Rouse (together, "County defendants") move for summary judgment of all claims in which they are named (Counts III, IV, V, and VI).[2]

For the reasons discussed below, Ford and the County's motions for summary judgment [docket entries #41 and 42] are hereby **ALLOWED in part and DENIED in part**. The City's motion for summary judgment [docket entry # 90] is **DENIED**. Specifically, I issue the following rulings:

1. Summary Judgment is **DENIED** as to the City's liability for the alleged booking search by City police officers at the Berkeley Street lockup.

2. Summary judgment is **GRANTED** for Ford as to the County and City's liability under the Fourth Amendment, and the City's liability under the Equal Protection Clause, for the strip and visual body cavity search by officials at the County

---

[2] This Court previously dismissed Count II of the plaintiff's complaint.

    Jail. The amount of damages to which Ford is entitled raises questions of fact that must be resolved in a future proceeding.

3. Rouse is entitled to sovereign immunity for his role in the strip-search at the County Jail.

4. Summary judgment is **DENIED** as to any defendants' liability under Article XIV of the Massachusetts Declaration of Rights.

5. Summary judgment is **GRANTED** in favor of the County defendants as to their alleged deliberate indifference to the plaintiff's medical needs while incarcerated. And finally,

6. Summary judgment is **DENIED** as to the City's liability for negligent infliction of emotional distress resulting from the searches at the City and County Jails.

## I. BACKGROUND

### A. Facts Relating to the BPD's Policy of Transferring Female Arrestees to the County Jail

The reader is referred to the Background section of the accompanying Memorandum Re: Motions for Summary Judgment by and Against the Class Plaintiffs [hereinafter, "Class Summary Judgment Memorandum"] for a general discussion of the BPD's

policy of transporting all female arrestees to the County Jail for detention pending an initial court appearance, and for a detailed description of the comprehensive strip-search policy in place at that Jail at the time Ford was detained there.

### B. Facts as Presented by the Plaintiff

Ford tells a very simple story. On February 19, 1997, she was arrested at her home on a default warrant for failure to pay a restitution fee on a charge of malicious destruction of property valued over $250.00.[3] On the way to the police vehicle, Ford was handcuffed. The arresting officers neither searched nor frisked her in any way during or after the arrest.

Upon arrival at the Berkeley Street lockup, Ford was searched by a female officer, Loletha Graham-Smith ("Officer Graham-Smith"). Ford alleges that she was completely naked during the search, but she does not indicate that Officer Graham-Smith conducted a visual body-cavity inspection.

Following the strip-search, Ford was allowed to dress. She was then placed in a cell to await transport to the County Jail. Ford was held in the cell, alone, for over an hour.

---

[3] Apparently, Ford struck someone's car with a bag of beer bottles and broke at least one headlight and one window.
　　The default warrant was later determined to be defective, as Ford had previously paid the restitution fee in full. Ford does not allege, however, that any of the defendants knew or should have known, at any time relevant here, that the warrant was defective.

Ford indicates that she was transported to the County Jail in the custody of two Boston police officers. According to the officers in question, although they do not specifically recall transporting Ford, their usual practice at the time was to ensure that arrestees never left their sight, custody, or control from the time they were taken from the holding cage at the City police station until they were turned over to booking officers at the County Jail. Arrestees remained handcuffed during the entire transfer.

As part of the admission process at the County Jail, Ford was required to submit to a full strip and visual body cavity search. As detailed in the Background section of the Class Summary Judgment Memorandum, this second strip-search was thorough, invasive, and humiliating. Ford indicates she was told to strip, to lift her breasts so the Jail officials could inspect underneath them, and to bend over and spread the cheeks of her buttocks apart. She was then allowed to dress and placed in a holding cell, where she remained overnight.

At some point during her ordeal, Ford avers, her personal belongings were confiscated by County officers. Although she repeatedly asked Jail officials to return certain prescription

medications, the officials refused either to return the medications or to attend to her medical needs in any other way.[4]

The next morning, Ford was taken to Lynn District Court. The court reviewed the docket in her case and ultimately dismissed the case, as "the warrant was issued in error."

### C. Facts as Presented by the Defendants

The defendants do not contest that City police officers arrested Ford, searched her at the Berkeley Street lockup, and then transferred her to the County Jail, where she was subjected to a strip and body cavity search. The defendants do, however, challenge certain other details of Ford's story.

Specifically, Officer Graham-Smith states that she does not remember searching Ford, but that it was not her practice to require female arrestees to be completely naked during a search. Further, the City indicates that Ford was carrying two sharp knives in her handbag at the time of the arrest.[5]

In addition, with respect to Ford's alleged requests for her medication while she was in County custody, the County defendants indicate that Ford never requested -- and, indeed, explicitly

---

[4] Although the record is not entirely clear on this point, Ford apparently takes a prescription medication to prevent migraines. She does not indicate whether she actually had a headache while in the County Jail, or simply wished to take the medication preventively.

[5] Although City officials apparently failed to find these knives, County officials found them upon Ford's admission to the County Jail.

refused -- medical attention while at the County Jail. Further, they allege that while Ford was at the Jail, she never informed Jail staff that she suffered from any conditions or symptoms requiring medical attention.

## II. DISCUSSION

### A. Summary Judgment Standard

The summary judgment standard is fully described in the corresponding section of the Class Summary Judgment Memorandum.

### B. Federal and State Constitutional Law Governing Strip-searches

The federal law in this Circuit regarding strip and visual body cavity searches is discussed at length in the Class Summary Judgment Memorandum. In this context, the following summary suffices.

Referring to the general issue of "reasonableness under the Fourth Amendment," the Supreme Court has instructed lower courts reviewing searches to "balanc[e] . . . the need for the particular search against the invasion of personal rights that the search entails" ("the Bell balancing test"). Bell v. Wolfish, 441 U.S. 520, 558 (1979). First Circuit case law applying this test provides additional, though somewhat equivocal guidance. In 1993, the court concluded that strip and visual

body cavity searches must be justified, at the least, by a reasonable suspicion that the individual being searched is carrying a weapon or harboring contraband.  Id., 117 F.3d 1, 7 (1st Cir. 1997).  The court did not, however, articulate the constitutional prerequisite to a strip-search in the absence of a visual body cavity inspection, stating only that "strip and/or visual body cavity searches are not routine, and must be carefully evaluated."  Then, in Roberts v. Rhode Island, the First Circuit suggested that in cases involving "particularly dangerous" prisoners or arrestees charged with violent felonies, institutional security concerns might justify strip and visual body cavity searches in the absence of particularized reasonable suspicion.  Roberts v. Rhode Island, 239 F.3d 107, 111 - 12 (1st Cir. 2001).

By comparison, state law on the issue is less ambiguous. Article XIV of the Massachusetts Declaration of Rights, Mass. Const. pt. 1, art. XIV, provides every person the right "to be secure from all unreasonable searches."  Swain v. Spinney, 117 F.3d at 11 - 12 (1st Cir. 1997).  Further, the Supreme Judicial Court recently held -- presumably, though not explicitly, under this Article -- "that probable cause is the appropriate standard to apply to strip and visual body cavity searches."  Commonwealth v. Thomas, 708 N.E.2d 669, 673 (Mass. 1999).  Thus, Massachusetts

courts apply a stricter standard to strip and visual body cavity searches than do federal courts in this circuit. Accord Swain, 117 F.3d at 11 (expressing a similar view, but before Thomas was decided).

### C.  Discussion of Plaintiff's Claims

In the interests of clarity, I discuss Ford's claims in the order in which the alleged injuries occurred, rather than the order in which the claims are listed in Ford's complaint. I therefore begin with the search at the Berkeley Street lockup, then address, in turn, the search at the County Jail, Sheriff Rouse's claim of qualified immunity, the plaintiff's claims under Article XIV of the Constitution of the Commonwealth, and the County defendants' alleged deliberate indifference to Ford's medical needs, and finally I address the City's liability for negligent infliction of emotional distress.

#### 1.   Search at the Berkeley Street Lockup

City liability for the alleged strip-search at the Berkeley Street lockup cannot be determined on summary judgment, as numerous issues of material fact remain unresolved. To begin with, although Ford claims that she was naked during the search, Officer Graham-Smith denies that the women she searched were completely naked at any point during a search. Without a more accurate factual picture of the extent of the search at the

Berkeley Street lockup, I can neither conduct the <u>Bell</u> balancing test nor determine the appropriate state legal standard to assess the constitutionality of that search.

Further, even assuming that the search at the Berkeley Street lockup was unconstitutional under the Commonwealth or Federal Constitution, Ford cannot establish City liability for the search unless she can show that an "official policy [was] the moving force [behind] the constitutional violation." <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658, 694 (1978); <u>Hancock v. Town of Wakefield</u>, 1996 WL 490175, *4 (Mass. Super. Ct. 1996) (concluding that the Supreme Judicial Court would apply <u>Monell</u> to the MCRA (citing <u>Rodriques v. Furtado</u>, 525 N.E.2d 1124, 1131 (1991))). I cannot make this determination on the record now before me.

In support of her claim that City policy provided the moving force behind the alleged constitutional violation, Ford maintains that the City failed either to promulgate a constitutional strip-search policy or to train its officers regarding the legal requirements for a strip-search. While I certainly agree that, in principal, failure to promulgate a policy or provide training "may be fairly said to represent a policy for which [a] city is responsible," such responsibility only attaches if "the need for more or different training is so obvious, and the inadequacy so

likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton Ohio v. Harris, 489 U.S. 378, 390 (1989).

Here, Ford variably alleges (1) that the BPD had a policy (Rule 318) under which all female arrestees were strip-searched, and (2) that the BPD had "no policy . . . on strip-searches and that such lack of policy caused the police officers to not know the rules regarding strip-searches." These vague and seemingly contradictory allegations are insufficient to prove, as a matter of law, that the City was "deliberately indifferent" to the constitutional rights of arrestees.

On the other hand, Ford does introduce sufficient evidence to raise a genuine question of fact as to whether the City paid adequate attention to the evolving case law regarding the constitutional requirements for a strip-search. Specifically, Officer Graham-Smith's testimony about the wide range of circumstances in which she routinely strip-searched arrestees strongly suggests a need for a new search policy and/or further training. Further, the City's blithe assertions that "Rule 318 does not mandate a strip-search," and "it is not the policy of the [BPD] to strip-search women being transferred to the Suffolk County Jail," do little to dispel this suggestion, particularly

as the City is apparently unable to articulate what its strip-search policy <u>was</u> at the time Ford was arrested.

Thus, I find that Ford has introduced sufficient evidence to raise genuine questions of fact regarding the constitutionality both of the strip-search at the Berkeley Street lockup, and of the City's then-applicable search "policy." These questions of fact preclude summary judgment in favor of either party on any issue arising out of the contested City strip-search. Ford and the City's motions for summary judgment are therefore **DENIED** insofar as they relate to the search at the Berkeley Street lockup.

### 2. Search at the County Jail

Ford's claims relating to the search at the County Jail are completely addressed by my discussion in the Class Summary Judgment Memorandum. Had Ford chosen to remain in the class, she would have been a member of Sub-Class I, as her underlying offense -- smashing the headlights of someone's empty car with an empty beer bottle -- involved neither drugs nor violence against another individual.[6] As such, Ford is entitled to damages from

---

[6] The fact that Ford had two small knives in her handbag when she was admitted to the County Jail does not affect this analysis. Ford indicates, and the County does not dispute, that the knives were "tiny" pen-knives, one wooden, and one with inlaid stones. Ford alleges she carried them to "cut apples and carrots at the barn to give my horse." If the presence of such small penknives in an arrestee's handbag, without more, were sufficient to create "reasonable suspicion" that the arrestee was harboring weapons or contraband, that jurisprudential standard would afford little protection. Almost every

the City and the County for violation of her Fourth Amendment rights in connection with the search at the County Jail, and from the City for violation of her equal protection rights. The amount of damages to which Ford is entitled remains to be determined. Ford's motion for summary judgment is therefore **GRANTED**, and the defendants' corresponding motions are **DENIED**, insofar as they relate to the City and County's liability for the unconstitutional search at the County Jail.

3.  **Sheriff Rouse's Qualified Immunity**

For the reasons stated in the Class Summary Judgment Memorandum, I conclude that Rouse has established the defense of sovereign immunity for his role in the County strip-search, as the search occurred before June 25, 1997, when the First Circuit issued its decision in Swain, supra. Accordingly, the County defendants' motion for summary judgment is **GRANTED** with respect to Sheriff Rouse's liability for Ford's injuries.

4.  **Claims under Article XIV of the Constitution of the Commonwealth**

The defendants seek summary judgment of the plaintiffs' claims under Article XIV of the Massachusetts Declaration of Rights, on the grounds that the "Declaration of Rights does not

---

woman carries some small sharp objects in her handbag -- nailfiles, keys, ballpoint pens, safety pins. I do not dispute the Jail officials' right and obligation to confiscate the knives, but I cannot accept that their mere presence in Ford's handbag justified her strip and visual body cavity search.

provide for a direct, private, right of action without a statutory basis or vehicle." This may be true, but it is irrelevant. As the First Circuit observed in <u>Swain</u>, the Massachusetts Civil Rights Act ("MCRA") provides a private right of action for vindication of "rights protected by either federal or state law." 117 F.3d at 11 - 12. Thus, the defendants' motions for summary judgment of Ford's Article XIV claims are **DENIED**.[7]

### 5. County Defendants' Deliberate Indifference to Ford's Medical Needs at the County Jail

I next consider the County defendants' request for summary judgment of Ford's Eighth Amendment allegations regarding inadequate provision of medical care at the County Jail. Ford's filings on this issue are quite sparse. In her complaint, she says only that during her detention, she "repeatedly asked for her medication (in her pocketbook) which was prescribed by her doctor for a serious health condition," and that these requests were denied, apparently by Jail officials. Then, in her opposition to the County defendants' motion for summary judgment, Ford alleges more broadly that she "requested [medical] help"

---

[7] Ford does not request summary judgment of this claim, so I reach no conclusion as to its underlying merits. I remind Ford, however, that in order to maintain her claim under the MCRA, she must ultimately prove, based on the specific facts of her case, that the injuries resulting from her strip-search were "perpetrated by 'threats, intimidation, or coercion' as required under Massachusetts law." <u>Swain</u>, 117 F.3d at 12.

while in the County Jail, but Jail officials "denied [her] her medication and ignored her medical needs." Neither of these pleadings provide any information at all about the nature of Ford's alleged medical condition.

Ford's deposition provides some additional information. For example, Ford indicates that she suffers from migraine headaches and takes beta blockers preventively. In the deposition, however, Ford directly states that she does not recall asking to see a nurse while at the County Jail, nor informing any staff at the Jail that she was "experiencing the symptoms of a migraine headache."

These few facts are simply insufficient to support Ford's Eighth Amendment claim. Most tellingly, Ford does not bring a claim against the individuals directly responsible for the alleged deprivation of medical care. As a result, her claim cannot be premised solely on Jail officials' treatment of her but must rest more broadly on the County and Sheriff Rouse's deliberate indifference to the medical needs of all Jail inmates. But Ford provides absolutely no evidence to support this broader claim. Without any such evidence, Ford's conclusory allegation that conditions at the Jail violate the Eighth Amendment cannot survive summary judgment. Accordingly, the County defendants'

motion for summary judgment of Ford's Eight Amendment claim is **GRANTED**.

### 6. City's Negligent Infliction of Emotional Distress (Count I)

Finally, I consider Ford's claim against the City for negligent infliction of emotional distress as a result of the strip-searches at the City and County Jails. This claim requires Ford to prove: "(1) negligence (duty of reasonable care and breach of that duty); (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under like circumstances." Brimage v. City of Boston, 2001 WL 69488, *1 (Mass. Dist. Ct. 2001) (citing Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982)). Ford bases the claim on the City's alleged failure to formulate a constitutional strip-search policy or to train City police officers regarding the constitutional prerequisites to such a search.

The City argues that it is entitled to summary judgment of this claim, because State law provides immunity to municipalities for "any claim arising out of an intentional tort." Mass. Gen. Laws ch. 258, § 10(c). The City observes that a strip-search "is a prototypical intentional act," and it therefore concludes that

it is immune to liability for any emotional distress Ford may have suffered as a result of the contested searches.

The City correctly states Massachusetts law, but I question its reasoning. While I certainly agree that a strip-search is an intentional "act," it is not an intentional <u>tort</u> unless the officer performing the search acted with "intent to harm (or a state of mind of knowing that the act would result in a violation of a legally protected right)." Foster v. McGrail, 844 F. Supp. 16, 25 (D. Mass. 1994) (citing Schenker v. Binns, 466 N.E.2d 131 (Mass. App. Ct. 1984)). Thus, the strip-searches of Ford cannot have been intentional torts unless the officers performing the searches knew at the time that the searches were unlawful. But this is precisely what Ford contests: She argues that the City failed to adequately train the officers, as a result of which they <u>did not know</u>, at the time, that the searches were unconstitutional. If Ford is ultimately able to prove her claim of failure to train she will also have conclusively proven that the strip-searches were not intentional torts.

Put differently, the fact that the same set of circumstances could also form the basis for intentional tort claims does not preclude Ford's alternative theory of the case. According to Ford, the City failed adequately to train its officers, so it is the City that should be liable for the officers' resulting

(uninformed, and therefore unintentional) violation of her rights. Ford must still establish the factual truth of this story at trial, but assuming she is able to do so, Massachusetts law does not grant the City immunity from her claim. Therefore, the City's request for summary judgment of this claim is **DENIED**.

III. CONCLUSION

For the reasons stated above and in the Class Summary Judgment Memorandum, all parties' motions for summary judgment are **GRANTED in part and DENIED in part**. The details of this decision are provided above and in the attached Order Re: Summary Judgment Motions.

SO ORDERED.

Dated: July 31, 2001

_____
NANCY GERTNER, U.S.D.J.