

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MASSACHUSETTS

BRONWYN FORD, KATRINA MACK,　　　）
et al., on behalf of themselves　）
and others similarly situated,　　）
　　　Plaintiffs,　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　　）　　Civ. No. 98-11346-NG
　　　　　　　　　　　　　　　　　　）
SUFFOLK COUNTY, RICHARD J. ROUSE　）
in his individual capacity, JANE　）
DOE in her individual capacity,　 ）
and the CITY OF BOSTON,　　　　　　）
　　　Defendants.　　　　　　　　　　）

GERTNER, D.J.

## MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT
## BY AND AGAINST THE CLASS PLAINTIFFS
July 31, 2001

## I.　INTRODUCTION

Between December 10, 1995, and September 20, 1999 ("class period"), the City of Boston ("City") followed an express policy of transferring all female arrestees who could not post bail to Suffolk County's maximum security Nashua Street Jail ("Jail"). In contrast, the City held male arrestees in City facilities. During the same time period, the Suffolk County ("County") Sheriff's Department followed an express policy of subjecting these Jail admittees -- all women -- to strip and visual body cavity searches.

Until May 24, 1999, the County's search policy was astonishingly broad. Under this pre-May 1999 policy, County officials strip-searched all arrestees admitted to the Jail,





regardless of the crimes with which they were charged, or any other individual factors.  Women were searched following arrests for crimes as minor as peddling sausages without a license, and larceny under $250 associated with the failure to return a rented video game.

The searches could not have been more degrading.  Officers inspected each woman's ears, mouth, and nostrils, humiliating or offensive to the dignity of the woman, asked her to lift each breast and to spread the cheeks of her buttocks so that the officers could inspect her genitals.

From May 24, 1999, until the end of the class period, the search policy was more limited, requiring a determination of probable cause prior to searches of misdemeanants.  The amended policy continued to permit suspicionless strip-searches of all arrestees charged with felonies, however, and it made no attempt to distinguish between arrestees charged with offenses involving violence or illicit substances, and other felony arrestees arguably less likely to be carrying weapons or contraband.

As a direct result of the City's transfer policy and the County's search policies, more than five thousand women[1] taken into custody by the Boston Police Department ("BPD") during the

---

[1] As noted below, the defendants indicate that almost 8,000 women meet this class description.  This larger number apparently includes many women who chose to opt out of the plaintiff class.

class period were transferred to the County Jail, where they were subjected to "routine"[2] strip and visual body cavity searches. At issue here are the basic rights of this class of women -- many of whom were detained solely because they could not afford to post bail. The women - a certified class - challenge the constitutionality of the Jail strip-searches on Fourth Amendment and equal protection grounds.[3]

This memorandum and order addresses the class' motion for summary judgment [docket entry #75], as well as the cross motion for partial summary judgment filed by the County, Richard J. Rouse ("Rouse") and Jane Doe ("Doe") (together, "County defendants") [docket entry #92]. For the reasons discussed below, I find and **DECLARE** the County's search policies during the class period facially unconstitutional. Summary judgment is therefore **GRANTED** in favor of the plaintiffs on all questions relating to the facial constitutionality of those policies.

I further find the County and the City liable under 42 U.S.C. § 1983 ("§ 1983") for violation of the Fourth Amendment

---

[2] I adopt the plaintiffs' terminology, but I note that I do not believe "'a strip-search can . . . be characterized as a routine procedure. . . . Indeed, a strip-search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual.'" Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996), cited with approval in Swain v. Spinney, 117 F.3d 1, 6 (1st Cir. 1997).

[3] One individual plaintiff, Bronwyn Ford, opted out of the class but continues to pursue her claims as an individual party to this action. I discuss her claims in a separate Memorandum, also issued today.

rights of all class members charged with felonies or misdemeanors involving neither violence nor drugs, and class members held on default warrants for similar offenses. Accordingly, summary judgment of liability against the County and City is **GRANTED** in favor of those plaintiffs.

With respect to Sheriff Rouse, I find that he is entitled to qualified immunity for his role in any unconstitutional strip-searches that occurred prior to June 25, 1997, when the First Circuit decided <u>Swain v. Spinney</u>, 117 F.3d 1 (1st Cir. 1997). As detailed below, however, he is liable for all unconstitutional strip-searches that occurred after that date. Accordingly, summary judgment of liability against Sheriff Rouse is **GRANTED in part and DENIED in part.**

Because of the state of the record, this Memorandum reaches no decision as to the defendants' Fourth Amendment liability for strip-searches of women arrested initially or on default warrants for crimes involving violence or drugs.[4] Accordingly, the plaintiffs' request for summary judgment of liability under the Fourth Amendment, and the County defendants' corresponding cross-motion for partial summary judgment, are **DENIED** with respect to those searches. As described below, further briefing and factual

---

[4] I note, however, that Sheriff Rouse's qualified immunity for searches conducted prior to June 25, 1997, extends to searches of women arrested initially or on default warrants for crimes involving violence or drugs.

development is necessary to clarify the claims of these class members.

To facilitate resolution of the remaining issues in this case, I hereby create two sub-classes of women: (1) those class members arrested (initially or on default warrants) for crimes involving neither drugs nor violence ("Sub-Class I"); and (2) those class members arrested (initially or on default warrants) for offenses involving either drugs or "violence" ("Sub-Class II").  See Fed. R. Civ. P. 23(c)(4).  The plaintiffs are **DIRECTED** to identify a named representative for Sub-Class II, or to propose further divisions of the sub-class, **by August 15, 2001**. This filing should also propose a suitable definition for the term "violence" in the context of this case.  The defendants' response is due within fifteen days thereafter.

Finally, I turn to the plaintiffs' claims against the City for violation of the Equal Protection Clause of the Fourteenth Amendment.  On this question, my holding is clear:  The record is more than sufficient to establish that the City denied <u>all</u> plaintiffs, in both Sub-Classes I and II, the equal protection of the laws.  Accordingly, the plaintiffs' motion for summary judgment of liability against the City for violation of the Equal Protection Clause is **GRANTED**.

## II.  BACKGROUND

### A.  Facts as Presented by the Plaintiff Class

The basic, largely uncontested facts of this case are both straightforward and appalling.  During the almost four-year period at issue here (and for several previous years), the City transported all female arrestees who could not post bail to the Suffolk County Jail, a maximum security pre-trial detention facility,[5] for detention pending their initial court appearance.[6] From the beginning of the class period until late May 1999 (almost a year after this action was filed), most if not all of these women -- regardless of the crime with which they were charged, or any other individual characteristics -- were strip-searched upon their admission to the Jail.[7]  Worse still, these

---

[5] According to Sheriff Rouse, the Jail was never intended to house pre-arraignment detainees.

[6] This practice began in March 1991, when the City closed its House of Detention and established a policy whereby "[f]emale prisoners arrested or detained by members of the Boston Police Department [("BPD")] [were] processed in the usual manner and then transported to the Suffolk County Jail . . . for detainment."  BPD Rule 318-C.  And the practice will apparently stopo as of September 2001.
    In apparent response to this ongoing class action, I note that the BPD recently announced that beginning as early as September 2001, it will no longer place female suspects awaiting arraignment in the custody of the County Sheriff's Department.  Francie Latour, Boston to Stop Holding Women Suspects in Suffolk Jail, Boston Globe, June 7, 2001, at A21.

[7] The County indicates that prior to May 24, 1999, the only detainees not searched were those who explicitly refused the search.  Those detainees were not housed with the general Jail population but were instead placed alone in a cell in the Booking Room and watched by a Jail officer.  The County provides no record of the number of women who avoided a search in this way.

routine strip-searches were mandated by Sheriff's Department policy ("Policy I").

On May 24, 1999, the County amended its policy to require a finding of probable cause prior to a strip-search of an arrestee charged with a misdemeanor, but the new policy ("Policy II") continued to require strip-searches of all arrestees charged with felonies.  Not until September 20, 1999 -- the end of the class period -- did the County finally eliminate routine strip-searches of all pre-arraignment detainees, including those charged with felonies.[8]

The County concedes that it made the first of these policy changes to conform -- albeit two years late -- to a 1997 First Circuit ruling, which held that "[s]trip and visual body cavity searches must be justified by at least a reasonable suspicion that [an] arrestee is concealing contraband or weapons."[9]  Swain, 117 F.3d at 6.  The County apparently made the second change to

---

[8] The parties' various filings are strangely silent about the County's search policy for prisoners held pursuant to default felony or misdemeanor warrants. As the County defendants' various filings argue that routine searches of such women are constitutional, I proceed on the assumption that both Policy I and Policy II allowed such searches without a finding of reasonable suspicion or probable cause.

[9] See County's Suppl. Resp. to Pls.' Fourth Set of Interrogs at Resp. 4.

bring its search policy into conformity with both state law and the BPD's newly adopted search policy.[10]

During the years in which strip-searches of women arrestees were routine, the searches were conducted without any individualized findings of reasonable suspicion. Many of the plaintiffs were searched following arrests for misdemeanors or nonviolent felonies, in situations in which there was no apparent reason to suspect them of carrying weapons or contraband. For example, the class representative, Katrina Mack, was strip-searched on March 5, 1998, after she was arrested for operating a motor vehicle while under the influence of alcohol and leaving the scene after causing property damage.[11] Another plaintiff was strip-searched after she was arrested for violating a municipal ordinance that prohibits peddling sausages without a license.[12]

---

[10] Id. at Resp. 5.

In 1999, the SJC concluded that "probable cause is the appropriate standard to apply to strip and visual body cavity searches." Commonwealth v. Thomas, 708 N.E.2d 669, 673 (Mass. 1999). The BPD then adopted a new policy, under which probable cause "to believe an arrestee has either contraband or weapons in his or her possession is necessary before a strip-search may be conducted." BPD Rule 318D.

[11] The plaintiffs' filings do not seem to indicate whether Mack was charged with a misdemeanor or a felony, but under Massachusetts law, "a first offense of operating while under the influence is a misdemeanor." Commonwealth v. Savage, 719 N.E.2d 473, 477 (Mass. 1999). In the absence of any contrary indication, therefore, I will assume Mack was charged with a misdemeanor.

According to the plaintiffs, 575 other members of the class were also charged with motor vehicle violations, including operating under the influence, and operating without a license.

[12] Plaintiffs indicate that like this woman, 137 women in the class were arrested for miscellaneous minor misdemeanors.

A third was arrested on a default warrant for larceny under $250.00, issued after her children failed to return a rented Sega video game.[13]

Even more troubling, the plaintiffs represent that many of the women strip-searched at the Jail had already been searched -- and some had undergone visual body cavity inspections -- while in BPD custody.  That is, according to the plaintiffs, these class members were first strip-searched by the BPD, then transported in BPD custody to the Jail, and then strip-searched again by the officials at the Jail.

Pursuant to the Sheriff's Department's Policy S507(B), the strip-searches at the Jail were incredibly thorough and invasive. Jail officials were told to:

1.      Instruct the inmate to empty his/her pockets and set aside property for searching.

2.      Instruct the inmate to remove all clothing and set aside clothes for searching.

3.      Visually examine the inmate's entire body in a careful and systematic order . . . to identify and seize contraband . . . .

---

[13] Plaintiffs maintain that 553 class members were charged with larceny, (90 for larceny under $250.00, and 463 for larceny over $250.00), 630 with shoplifting, and 156 with uttering.

Additional statistics provided by the plaintiffs include: 286 class members charged with trespass; 351 with disorderly conduct; 201 with receiving a stolen motor vehicle; 588 with domestic assault and battery; and 188 with violation of a restraining order.

4.          Start with the inmate's head and hair.
            Have the inmate run through his/her hair
            with his/her fingers.

5.          Examine behind the inmate's ear.

6.          Check the inmate's mouth by having
            him/her open wide . . . .

7.          Check the inmate's nostrils for any
            abnormalities.

8.          . . . Check his/her entire back and
            chest down to the waist line.  Then have
            the inmate roll his/her hands 180
            degrees forward and then backwards with
            his/her fingers widespread.  You should
            also check under his/her fingernails.
            Check his/her armpits carefully and then
            examine down the sides of his/her body
            to the waist line.  If the inmate is
            female, she must lift each breast
            separately so that you can check for
            possible contraband . . . .

9.          . . . [E]xamine the inmate's buttocks
            and groin area . . . .

       a.   The inmate must be told to bend forward and
            spread the cheeks of his/her buttocks.  Be
            sure to look for possible strings
            protruding from the anus or vagina . . . .

       b.   The front groin (pubic) area and in between
            the inmate's legs must be checked
            thoroughly . . . .

10.         . . . [S]earch down both of the inmate's
            legs - front, back, inside and out.

11.         . . . [C]heck the inmate's feet.  Don't
            forget to look between each toe and
            check the bottom of each foot.

Although the County issued a new strip-search policy every year, the basic procedure did not change.

Despite this exhaustive search procedure, plaintiffs assert, strip-searches of BPD arrestees during the class period only uncovered contraband 0.063% of the time -- on five occasions, during a period in which almost 8,000 female arrestees were brought to the Jail by Boston police.

Another disturbing aspect of this story is the City's disparate treatment of male and female arrestees.  In accordance with City policy during the class period, only female arrestees who could not post bail were transported to the Jail.  As a result, although both male and female arrestees were subjected to searches during booking at City police stations,[14] male arrestees who could not post bail were then held in City police lockups and only rarely subjected to a second search, while female arrestees were brought to the Jail, where they were routinely subjected to humiliating strip and visual body cavity searches.

### B.  Contested Issues of Fact Identified by the County and Sheriff Rouse

The defendants concede many of the facts detailed above, but they insist that a few key issues remain in dispute.  For

---

[14] The City's search policy and practice apparently varied during the class period, but the plaintiffs allege that both men and women were frequently strip-searched incident to booking, and a few plaintiffs claim they were also subjected to visual body cavity inspections while in BPD custody.

example, the County challenges the plaintiffs' assertion that
only 0.063% of searches conducted at the Jail produced
contraband.  The County argues -- with some testimonial support,
but no data -- that Jail officers in fact uncovered contraband
"on a regular basis" as a result of searching BPD detainees.
Further, the County maintains that the very fact that some of the
Jail searches of BPD detainees uncovered contraband indicates
that "proper searches were not conducted by Boston Police before
transportation to the Jail."

The County also takes issue with the plaintiffs' statistics
regarding the crimes with which class members were charged, and
it offers alternative data.  Of most relevance here, the County
indicates that it believes there were 7,907 admissions of BPD
detainees during the relevant time period,[15] of which 5,080 were
held on misdemeanors only, 2,048 were held on felonies only, and
774 were held on both misdemeanors and felonies.[16]  The County
emphasizes that these figures do not indicate that 7,907 women
were strip-searched during the class period.  It concedes,
however, that its policy until May 1999 was to strip-search all

---

[15] This number includes all BPD detainees admitted to the Jail during the time
period at issue here.  It therefore counts all women who fit the class
description, including those who opted out of this action.  (The parties offer
no explanation for the difference between this figure (7,907) and the numbers
cited by the plaintiffs (7,878 at one point, and 8,109 elsewhere).

[16] Five women cannot be placed into one of these three categories due to an
obscure problem with the County's charge data.

-12-

arrestees admitted to the Jail except those who specifically objected to the search, and it offers no data regarding the number of women who objected during the period.

Turning to the question of liability, the County argues that its obligation to ensure safety at the Jail raises an issue of material fact that cannot be addressed on summary judgment. Specifically, the County notes that the Jail is primarily a maximum security pretrial detention facility.  It suggests that institutional security concerns during the class period required that BPD detainees entering the Jail be strip-searched before they were brought in contact with the general population.  In light of these concerns, the County argues that before this Court can evaluate the reasonableness of the contested strip-searches, the fact-finder must determine the appropriate "weight to be given the institutional security needs" at the Jail.

Finally, the County and Sheriff Rouse argue that there is an outstanding issue of fact regarding the role that Rouse played in promulgating Suffolk County Sheriff's Department policies.  The County avers that it will demonstrate at trial that "someone other than . . . Rouse had final authorization" to issue such policies.

C.    **Contested Issues of Fact Identified by the City**

The City, too, identifies issues of fact that it believes preclude summary judgment for the plaintiffs.  Specifically, although the City admits that it transferred all of the plaintiffs to the Jail, it asserts that it had no authority or control over the manner in which they were treated at the Jail, and it further suggests that it was entitled to assume that the County's treatment of the women was constitutional.  At "worst" (from its perspective), the City argues that any question of vicarious City liability for searches conducted pursuant to County strip-search policies raises issues of fact regarding whether the City had actual or constructive knowledge of the County policies.


III. DISCUSSION

A.    **Summary Judgment Standard**

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "material" means that "a contested fact has the potential to change the outcome of the suit . . . if the

-14-

dispute over it is resolved favorably to the nonmovant."

McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir.

1995). Similarly, "genuine" means that "the evidence about the

fact is such that a reasonable jury could resolve the point in

favor of the nonmoving party." Id.

In ruling on a summary judgment motion, a court must view

the facts in the light most favorable to the non-moving party.

Rodriquez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st

Cir. 1999). Overall, therefore, Rule 56(c) "mandates the entry

of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at

trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Finally, I note that where, as here, there are dueling

motions for summary judgment, the Rule 56 standard remains

intact. The motions "simply demand that all factual disputes and

any competing rational inferences be resolved in the light most

favorable to the party opposing summary judgment." Santana v.

Deluxe Corp., 12 F. Supp. 2d 162, 167 (D. Mass. 1998) (citing Den

Norske Bank v. First Nat'l Bank of Boston, 75 F.3d 49, 53 (1st

Cir. 1996)).

### B.    Constitutionality of the Search Policies

The plaintiffs' overarching request is that I "declare that the policy or practice of conducting routine strip-searches and routine visual body cavity searches of women is illegal and unconstitutional" and "enjoin enforcement" of the challenged County search policies.[17]  For the reasons discussed below, these requests are **GRANTED** with respect to both Policies I and II.[18]

#### 1.    Legal Background

As the First Circuit recently held in a similar case, "[b]oth convicted prisoners and pretrial detainees" -- and therefore, clearly, the pre-arraignment arrestees who largely make up the plaintiff class here -- "retain constitutional rights despite their incarceration, including basic Fourth Amendment rights against unreasonable searches and seizures." Roberts v. Rhode Island, 239 F.3d 107, 109 - 10 (1st Cir. 2001).[19]  Since

---

[17] I recognize that neither Policy I nor II remains in effect, and further, that the SJC's recent decision in Commonwealth v. Thomas, supra note 11, renders it unlikely that the City or County will ever again pursue a policy of strip-searching arrestees without probable cause.  Nevertheless, the plaintiffs' claims for declaratory and injunctive relief are not moot, as the defendants have not established that it is "'absolutely clear'" their "'wrongful behavior'" will not recur.  Mack v. Suffolk County, 191 F.R.D. 16, 21 (D. Mass. 2000) (citing City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1983)).

[18] I emphasize that this finding does not resolve the issue of the defendants' liability for the strip-searches of class members.  That issue is discussed at length below.

[19] As indicated below, the Roberts decision involved a constitutional challenge to two Rhode Island blanket strip-search policies.

-16-

the detainees are confined, their rights may be somewhat more
limited than those of the general public, but they are not the
nullity that Suffolk County's expansive strip-search policies
would suggest.

Strip and visual body cavity searches are far from
"routine."  The Supreme Court indicated more than twenty years
ago that such searches "instinctively give[ it] . . . pause,"
Bell v. Wolfish, 441 U.S. 520, 558 (1979), and since then courts
have used much stronger language.  The First Circuit, for
example, deems such searches "an 'extreme intrusion' on personal
privacy and 'an offense to the dignity of the individual.'"
Roberts, 239 F.3d at 110 (citing Wood v. Clemons, 89 F.3d 922,
928 (1st Cir. 1996)).  The Seventh Circuit's language is even
more strident:  "[S]trip searches involving the visual inspection
of the anal and genital areas [are] demeaning, dehumanizing,
undignified, humiliating, terrifying, unpleasant, embarrassing,
repulsive, signifying degradation and submission."  Mary Beth G.
v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983) modified
(1984) (internal citations omitted).

These strong sentiments, which I share, provide the backdrop
for my analysis of the challenged County search policies.  In
addition, the courts have provided a more explicit -- if
occasionally inconsistent -- analytic framework.  The foundation

for this framework is the Supreme Court's observation in <u>Bell</u>
that the "test of reasonableness under the Fourth Amendment . . .
requires a balancing of the need for the particular search
against the invasion of personal rights that the search
entails."[20]    <u>Bell</u>, 441 U.S. at 559.  To perform this "<u>Bell</u>
balancing test," the Court instructed future courts to "consider
the scope of the particular intrusion, the manner in which it is
conducted, the justification for initiating it, and the place in
which it is conducted."  <u>Id.</u>

   Applying this test almost two decades later, the First
Circuit concluded that strip and visual body cavity searches
"must be justified by <u>at least</u> a reasonable suspicion that the
[<u>particular</u>] arrestee is concealing contraband or weapons."
<u>Swain</u>, 117 F.3d at 7 (emphasis added).  Earlier this year, the
First Circuit again applied the "reasonable suspicion" standard
to strike down two Rhode Island policies under which arrestees
were routinely strip-searched prior to admission to a state
prison.  <u>Roberts</u>, 239 F.3d at 108.  Further, the Court found the
Rhode Island blanket strip-search policies unconstitutional even
though the plaintiff in the case was held in a maximum security
facility where arrestees routinely "mingle[d] with the general

---

[20] This is commonly referred to as the "<u>Bell</u> reasonableness test."  <u>E.g.</u>,
<u>Roberts</u>, 239 F.3d at 108.

population" -- circumstances arousing precisely the same institutional security concerns invoked by the defendants here.[21] Id. at 112 - 13.

In their filings, the defendants cite the Roberts decision, for the proposition that the reasonable suspicion standard only applies "in the context of prisoners held in local jails for minor offenses." Further, the County invokes Roberts to support its institutional security arguments, because the Roberts court observes in passing, "institutional security is a legitimate need of law enforcement, and may provide a compelling reason for a warrantless strip-search absent reasonable suspicion of individual wrongdoing." Roberts, 239 F.3d at 110, 111.

The County takes these quotations entirely out of context. Both of these observations appear in dicta preceding the court's discussion of Roberts' specific claims. Further, even in its discussion of "compelling" institutional security concerns, the Roberts court provides only two examples of circumstances in which blanket warrantless and suspicionless searches may be constitutional: (1) searches of inmates after largely private, full-contact visits with outsiders; and (2) searches of

---

[21] I also note that Roberts was arrested on an outstanding "body attachment" - - a Rhode Island writ that "allows officers to take the defendant into custody if the family court is not in session." Id. at 108 n.2. Thus, Roberts' arrest was sanctioned by a judge, much like the arrests on default warrants at issue here.

"particularly dangerous inmates" returning to a "special security area" of a maximum security prison after a visit to the law library or infirmary.[22]  Id. at 111 (citing Bell, 441 U.S. at 558 - 59; Arruda v. Fair, 710 F.2d 886, 888 (1st Cir. 1983)). Neither example applies here.

The Roberts court's only other reference to circumstances possibly justifying a blanket search policy that does not require individualized suspicion is its later observation, also in dicta, that the "reasonable suspicion standard may be met simply by the fact that the inmate was charged with a violent felony." Id. at 112 (emphasis added).  These dicta, however, give little guidance as to what sort of felony is categorized as "violent," or why someone charged with such an offense should be suspected of concealing weapons or contraband.  One might argue, for example, that while the nature of the crime for which someone was arrested should be considered in evaluating the presence or absence of a "reasonable suspicion" to search, does not independently establish "reasonable suspicion" sufficient to justify a blanket search policy.

    2.  **Policy I**

---

[22] In addition to the factors referenced in the text, the prison in question also had a long, well-documented history of contraband problems.  Roberts, 239 F.3d at 111 (citing Arruda, 710 F.2d at 888).  Though the defendants here argue that the County Jail has such a contraband problem, they provide little data to support their contention that BPD arrestees contribute to the problem in any way.

The First Circuit's analysis in <u>Roberts</u> may signal a certain ambivalence about the reasonable suspicion standard and the relationship between that standard and institutional security concerns, but that ambivalence does not affect the outcome here. In this case, there is absolutely no question that the County's concern for the security of the Jail does not justify its pre-May 1999 policy of searching all BPD arrestees without any individual or class-wide findings of reasonable suspicion.

To begin with, by the defendants' own admission, the majority of the BPD arrestees were charged with misdemeanors or other minor offenses, and fewer than a quarter of those arrestees were charged with drug offenses.  Further, the record in this case clearly indicates that many or even most members of the plaintiff class had already been searched[23] during booking by the BPD, and had been transported to the Jail <u>in BPD custody</u>.[24] Under these circumstances, the County cannot reasonably have

---

[23] The defendants dispute the plaintiffs' claim that City police officers strip-searched female arrestees as part of a routine booking search.  The City provides no evidence, however, to refute the numerous depositions submitted by the plaintiffs, in which female officers indicate that they routinely required women to strip, partially or completely, during a booking search.

[24] The County's observation that Jail officials found some contraband on BPD arrestees in spite of the prior booking searches does little to convince me that the contested searches were necessary.  Though there is some factual dispute as to the amount of contraband discovered as a result of the strip-searches of BPD arrestees, the County has produced only five records indicating that Jail officials discovered contraband <u>as a result of</u> an intrusive strip-search.  "The lack of specific instances where a body cavity search was necessary to discover contraband supports a finding that the policy of searching all [arrestees] is an unreasonable one." <u>Id.</u> at 112.

suspected the women, as a class, of harboring weapons or contraband at the time of admission.

The County posits that because BPD arrestees joined the general population at the maximum security Jail, they could have served as a conduit for the introduction of drugs or other illicit items. I find this unlikely. It defies belief to suppose that any of the plaintiffs deliberately sought arrest in order to smuggle contraband or weapons into the Jail. Cf. Roberts, 239 F.3d at 111 (noting the "essentially unplanned nature of an arrest and subsequent incarceration"). Further, Jail officials here had no reason to believe -- and, indeed, numerous reasons to doubt -- that the BPD arrestees, as a class, were particularly dangerous. It may be reasonable "to safeguard[] institutional security" by engaging in "extra efforts to ensure that the most dangerous inmates do not have access to weapons or contraband," but "the extension of the intrusion to far less dangerous inmates . . . is a severe incursion on privacy frowned upon by the Bell balancing test." Id. at 111.

Finally, I note that if the County truly had serious concerns about allowing the BPD arrestees to mingle with the general population, it could simply have held the women in a separate area of the Jail during their short stays. Indeed, the County admits that since May 1999, when it abandoned Policy I, it

-22-

has housed all BPD arrestees in a booking area separate from the Jail's main housing unit.  In light of this policy change, which clearly indicates the ready availability of isolated space to house BPD arrestees, the County's earlier choice to strip-search all BPD arrestees is nothing short of outrageous.

Nothing on the record before me, therefore, justifies the search policy in place at the Jail prior to May 24, 1999.[25]  Jail officials made no individualized findings of reasonable suspicion prior to conducting strip-searches of BPD arrestees.  Nor were there any class-wide characteristics or factual circumstances that warranted such searches in every case.  While I understand the County's concern over institutional security, that concern does not excuse the County's decision to require the women in the plaintiff class -- many of whom had yet to see a judge -- to endure the indignities of a strip and visual body cavity search. "'[A]n indiscriminate strip-search policy routinely applied . . . can not be justified simply on the basis of administrative ease in attending to security considerations.'" Roberts, 239 F.3d at 113 (quoting Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981)).

---

[25] I recognize that the challenged searches would have been still worse if, for example, Jail officials had performed them in a public setting, or if male officials had searched the female arrestees.  The absence of these aggravating factors does not, however, render harmless the County's misguided search policy.  Cf. Roberts, 239 F.3d at 107 (noting that the unconstitutional search at issue in that case was performed "in a relatively private manner").

Thus, Policy I fails to satisfy the <u>Bell</u> balancing test and falls well short of the constitutional standards articulated by the First Circuit in <u>Swain</u> and <u>Roberts</u>.  Accordingly, I find the policy facially unconstitutional under the Fourth Amendment.

### 3.    **Policy from May 24 to September 20, 1999**

As noted above, the County amended its search policy on May 24, 1999, to require a finding of probable cause prior to a strip-search of any pre-arraignment detainee arrested for a misdemeanor.  With County approval, though, Jail officials continued to search everyone else -- all BPD arrestees charged with felonies, and apparently, those held on default warrants -- without any individualized finding of reasonable suspicion, let alone probable cause.

Policy II also fails Fourth Amendment scrutiny.  As indicated above, the First Circuit has only identified a few narrow circumstances in which the reasonable suspicion standard is inapplicable, and blanket strip-searches permissible.  None of those circumstances is present here.  This case does not involve full-contact visits with outsiders, but rather routine admissions of new arrestees.  There is no indication that women arrested by the BPD after May 1999 were "particularly dangerous," or that the Jail had a "lengthy [documented] history" of "contraband

problems."[26]  Finally, the County made no effort to distinguish

women charged with violent felonies from those held on default

misdemeanor warrants or charged with lesser felony offenses --

like the plaintiff charged with larceny over $250.00 for failing

to return a rented video game.[27]  I find no support in the First

Circuit case law, or anywhere else, for the County's peculiar

conviction that State officials may constitutionally strip-search

all felony arrestees, and all arrestees held on default warrants,

upon admission to the Jail.

Indeed, quite apart from First Circuit law, there is simply

no rational basis for making such a consequential and yet

arbitrary distinction between groups of BPD arrestees.  While the

felony-misdemeanor distinction provides a convenient benchmark by

which society can estimate the seriousness of an offense, it

offers little information about the likelihood that an individual

arrestee is concealing weapons or contraband.[28]  Why, for

example, should a woman charged with larceny over $250.00 be

suspected of concealing contraband and therefore subjected to a

---

[26] See supra note 22.

[27] Mass. Gen. L. ch. 266, § 30 (defining larceny over $250.00 as a felony offense).

[28] See generally Gabriel M. Helmer, Note, Strip-search and the Felony Detainee: A Case for Reasonable Suspicion, 81 B.U. L. Rev. 239, 284 (2001) (surveying cases and concluding that the "circuits have found, in interpreting the Bell standard, that the mere classification of the crime charged, whether felony or misdemeanor, is irrelevant."

routine suspicionless strip-search, when a woman charged with
misdemeanor possession of drugs cannot be strip-searched without
probable cause?  A blanket search policy that distinguished
between violent and nonviolent felons might be closer to the
mark, offering an arguably reasonable -- or at least rational --
approach to balancing the need for particular searches against
the indignities consequent to such invasions of privacy, but
drawing the line between misdemeanants and felons is not.

Similarly, the mere fact that women held on default warrants
"ha[ve] been arraigned, ha[ve] had bail set and ha[ve] defaulted
on . . . court appearance[s]" does not, as the County maintains,
justify routine suspicionless strip-searches.  There is no reason
to suppose that a woman who once failed to appear before a court
is, as a result, more likely to be carrying a weapon or
contraband if and when she is later arrested.  Indeed, the
plaintiff in Roberts was arrested on such an outstanding warrant,
and the First Circuit itself observed that "both highly dangerous
and relatively harmless offenders may be incarcerated with
judicial approval."  Roberts, 239 F.3d at 111.  In light of this
observation, the County's position that the "need" to search all
women arrested on default warrants somehow outweighs the
resulting invasion of personal rights is simply incomprehensible.

In short, I find no reason to believe that a woman charged with a felony or held on a default warrant inherently presents a greater risk to prison security (through introduction of weapons or contraband) than a woman charged with a misdemeanor. As a result, I am not persuaded that the County corrected the constitutional deficiencies in Policy I simply by instituting a requirement of probable cause prior to a strip-search of misdemeanor arrestees. The Fourth Amendment right against unreasonable searches mandates some effort by Jail officials either to premise searches on individualized reasonable suspicion or to identify classes of arrestees that reasonably pose a heightened risk to institutional security. Policy II does neither and is therefore facially unconstitutional.

C.    **Defendants' Liability**

Although the County's search policies during the class period are facially unconstitutional and warrant declaratory relief for the plaintiffs, the defendants' liability for the promulgation and implementation of those policies -- and thus, the damages due to the individual plaintiffs -- presents a harder question. I first discuss the County's liability under the Fourth Amendment. I then consider Sheriff Rouse's claim of qualified immunity for unconstitutional searches. Finally, I turn to the City's liability for the searches, first under the

Fourth Amendment and then under the Equal Protection Clause of
the Fourteenth Amendment.

### 1.   The County's Liability for Fourth Amendment Violations

To hold a local government entity liable under 42 U.S.C. §
1983 for civil rights violations committed by its employees, a
plaintiff must establish that the violations resulted from
implementation or execution of a policy or custom of the entity.
Monell v. New York City Dept. of Social Services, 436 U.S. 658,
690 - 91 (1978).  Here, there can be no question that (1) prior
to May 1999, Suffolk County had an explicit policy of strip-
searching every BPD arrestee admitted to the Jail, regardless of
any individual characteristics, and (2) between May and September
1999, the County had an explicit policy of strip-searching all
BPD felony arrestees and arrestees held on default warrants,
again regardless of any individual characteristics.  Thus, if any
of the resulting searches were unconstitutional, the County is
liable under Monell.

The next question, therefore, is whether any or all Jail
searches of BPD arrestees during the class period violated the
arrestees' civil rights.  As Policies I and II are facially
unconstitutional, it is tempting to conclude that all searches
conducted while those policies were in effect were also
unconstitutional.  At this stage, however, I decline to make such

a broad finding as a matter of law.  Among other issues, it may

well be that women charged with certain violent felonies are not

entitled to damages for violations of their Fourth Amendment

rights in connection with the Jail searches.  Even though the

County policies under which these women were searched were

unconstitutional, the particular searches may not have been.

Thus, I find it appropriate to subdivide the plaintiff class into

two sub-classes, the first made up of women to whom the County is

clearly liable in damages as a matter of law, and the second made

up of women whose stories present more difficult questions.

In identifying the line that separates these sub-classes, I

am guided at this preliminary stage by my conviction that

arrestees charged with offenses -- felonies or misdemeanors --

that involve neither drugs nor violence pose no inherent risk to

the institutional security of a detention facility.  I am also

guided by the First Circuit's suggestion in dicta that the

"reasonable suspicion standard may be met simply by the fact that

[an] inmate was charged with a violent felony."  Roberts, 239

F.3d at 112.  While I am not persuaded that this statement

governs my decisions in this case, it does convince me that on

the record now before me, I cannot determine that all plaintiffs

charged with violent felonies are entitled to damages from the

County as a matter of law.

Based on these principles, I define the following sub-classes: (1) Sub-Class I: class members who were searched following arrests (either originally or on a default warrant) for offenses involving neither violence nor drugs (class representative Katrina Mack); and (2) Sub-Class II: the remaining class members, who were searched after following arrests for offenses (either misdemeanors or felonies) involving drugs or "violence" (class representative to be determined).[29]

### a.    County Liability to Sub-Class I

There can be no question about the County's liability in damages to the women in Sub-Class I. All of these women were subjected to horribly invasive strip and visual body cavity searches. The County made no pretense of balancing the need for the searches against "the invasion of personal rights that the search[es] entail[ed]." Bell, 441 U.S. at 559.

Further, even if I were to allow the County now to propose a retroactive rationale for the searches, nothing the County could suggest would suffice to justify its routine policy of searching women whose alleged conduct -- whether misdemeanor or felony -- involved neither drugs nor violence. Why should a woman charged

---

[29] I reach no decision here as to the definition of the term "violence" in the context of this case. As indicated below, the parties are invited to propose a suitable definition in their next filings to this Court. In so doing, the parties should keep in mind that the object of this endeavor is to separate offenses that inherently generate a suspicion the offender may be concealing weapons or contraband, from offenses that generate no such suspicion.

with uttering a forged check -- or, for that matter, violating a regulation governing sausage peddling -- therefore be suspected of carrying concealed weapons or drugs?[30]  There is no rational reason for the County to have concluded that these women, <u>as a class</u>, posed a threat to the institutional security of the Jail.

Accordingly, the plaintiffs' motion for summary judgment of liability against the County is **GRANTED in part**.  The County is liable in damages for the unconstitutional searches of all women in Sub-Class I.  With respect to Sub-Class I, therefore, this action will now proceed to individual hearings to determine the amount of damages owed to each woman.  One further caveat:  If the County can produce evidence suggesting that it had individualized reasonable suspicion to search any particular woman in Sub-Class I -- due, for example, to her conduct during arrest -- it is invited to introduce that evidence during the individualized damages hearings.  The Court or the fact-finder will then make findings of fact, and I will adjust my estimate of liability accordingly.

---

[30] This conclusion is only strengthened by the particular facts of this case, including the prior BPD booking searches, the women's transferral to the Jail <u>in BPD custody</u>, and the documentary evidence suggesting that full strip and visual body cavity searches only rarely resulted in the discovery of contraband.

### b.    County Liability to Sub-Class II

On the record now before me, the County's liability in
damages as a matter of law to the women in Sub-Class II is less
clear.  While I appreciate these plaintiffs' argument that they
are entitled to damages because the County did not, at the time
of the searches, conduct the Bell balancing test, let alone make
individualized findings of reasonable suspicion, I also recognize
that generic characteristics may occasionally generate sufficient
security concerns to justify "warrantless strip-search[es] absent
reasonable suspicion of individual wrongdoing."  Roberts, 239
F.3d at 111.  In this case, the maximum security Jail sought,
reasonably, to prevent the introduction of drugs or weapons.  It
therefore seems plausible -- albeit barely -- that Jail officials
could constitutionally have followed a policy of searching
arrestees charged with certain crimes, namely those involving
weapons or drugs, on the theory that perpetrators of such crimes
are marginally more likely to be hiding weapons or drugs on their
person at the time of the arrest.

I emphasize, however, that this discussion does not
constitute a prediction that the County will ultimately be
absolved of liability for the routine searches of the women in
Sub-Class II.  Rather, my point is merely that on the record now

before me, I cannot conclude as a matter of law that those women are entitled to damages.

The plaintiffs' current filings paint a very sympathetic picture of the class as a whole, because they tell the stories only of those women arrested for minor and nonviolent offenses. Before I reach any decision regarding the County's liability to the women in Sub-Class II, I must have some better understanding of the types of crimes with which the women were charged. Accordingly, summary judgment of liability is **DENIED** with respect to Sub-Class II.

To facilitate resolution of the remaining issues relating to Sub-Class II, the plaintiffs are **ORDERED** to identify a sub-class representative, or to propose further subdivisions of the sub-class,[31] by **August 15, 2001**.  In this same filing, the plaintiffs are instructed to propose a suitable definition for the terms "violence" and "violent offense," as used herein.  The defendants may respond within fifteen days thereafter.

### 2.    Sheriff Rouse's Liability for Fourth Amendment Violations

The parties agree that the Sheriff of Suffolk County "has final policymaking authority for establishing policies for conducting searches of prisoners at the Nashua Street Jail."

---

[31] Cf. United States Parole Commission v. Geraghty, 445 U.S. 338, 408 (1980) (discussing "the burden of constructing subclasses").

Thus, because Rouse became Sheriff in October 1996 and remained in that position for the rest of the class period, he clearly bears responsibility for the County's unconstitutional strip-search policies during most of the class period.

The County's argument to the contrary -- that Rouse never directly "exercised []his authority" to establish County search policies, but instead "relied on the expertise of his staff in promulgating Department policies" -- is unavailing.  Sheriff Rouse's hands-off approach to his job does not absolve him of responsibility for unconstitutional policies developed and promulgated by his underlings on his watch.

The only outstanding question relevant to Rouse's liability in damages, therefore, is whether he is entitled to immunity for any of the unconstitutional searches performed during the class period.  The Supreme Court established the standard for qualified immunity[32] two decades ago, in Harlow v. Fitzgerald:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . If the law at [the time of the offense] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments,

---

[32] There can be no question that, "as a prison administrator, the Sheriff is entitled to invoke [this] immunity defense." Blackburn v. Snow, 771 F.2d 556, 569 (1st Cir. 1985).

nor could he fairly be said to "know" that the law
forbade conduct not previously identified as unlawful.

Id., 457 U.S. 800, 818 (1982); see also Blackburn v. Snow, 771

F.2d 556, 569 (1st Cir. 1985) (discussing a Sheriff's potential

qualified immunity in a context similar to that here).  This

standard requires a court to inquire first whether the

constitutional right in question was clearly established at the

time of the injury, and second whether "a reasonable, similarly

situated official [would have understood] that the challenged

conduct violated that established right."  Swain, 117 F.3d at 9.

Applying this standard here, I find Sheriff Rouse entitled to

qualified immunity for all unconstitutional searches conducted

prior to the First Circuit's 1997 decision in Swain, but liable

in damages for all such searches performed thereafter.

The law governing strip-searches has changed significantly

over the last thirty years.  As recently as 1975, the First

Circuit held that post-arrest searches involving visual body

cavity inspections were "plainly authorized" by Supreme Court

precedent and required no further scrutiny under the Fourth

Amendment.  United States v. Klein, 522 F.2d 296, 300 (1975).

Since then, the Court has come full circle, announcing on June

25, 1997 that Klein is no longer good law, and further, that

strip and visual body cavity searches cannot be conducted without

individualized reason to suspect that the arrestee is harboring

weapons or contraband.  <u>Swain</u>, 117 F.3d at 7.

This is precisely the sort of situation for which the

doctrine of qualified immunity was developed.  The rationale for

the doctrine is, in part, that it reduces the likelihood that

"able citizens" will be deterred "from accept[ing] public office"

by the possibility of personal liability for actions taken in

good-faith reliance on uncertain legal standards.  <u>Harlow</u>, 457

U.S. at 814.  I therefore find that Sheriff Rouse has established

the defense of qualified immunity for those searches.  Between

1975 and 1997, the lingering effects of <u>Klein</u> sufficiently

muddied the waters of Fourth Amendment jurisprudence in this

Circuit that a reasonable person in the Sheriff's position could,

in good faith, have believed the County's routine search policy

to be constitutional.[33]

In conclusion, therefore, summary judgment of liability

against Sheriff Rouse is **GRANTED in part**, and the County

defendants' motion for summary judgment is also **GRANTED in part**.

I find Rouse liable in damages to all members of Sub-Class I who

were searched at the Jail <u>after June 25, 1997</u>.  As discussed

---

[33] In fact, the district judge in <u>Swain</u> himself concluded that "[a]lthough
Klein predate[d] the premiere Supreme Court case on strip-searches, <u>Bell</u> . .
., it remain[ed] valid First Circuit law.  <u>Swain</u>, 932 F. Supp. 25 (D. Mass.
1996), <u>rev'd</u>, 117 F.3d 1 (1st Cir. 1997).

above for the County, the amount of those damages will be determined in future, individualized hearings.[34]

Rouse's liability for searches of the women in Sub-Class II remains to be determined, but should those searches ultimately be found to be unconstitutional, Rouse will only be responsible for searches conducted after June 25, 1997.[35]

### 3.    The City's Liability for Fourth and Fourteenth Amendment Violations

City liability for the Jail searches of BPD arrestees poses an interesting question of institutional responsibility. Again, the governing standard derives from Monell:  § 1983 provides a cause of action against a municipality for violations resulting from implementation or execution of city policies or customs. Monell, 436 U.S. at 690 - 91.  In this case, though, the plaintiffs' claims fit none of the standard analytic models for municipal liability.  For example, the City, unlike the County, had no express policy of subjecting all BPD arrestees to strip and visual body cavity searches.  Indeed, the City claims -- and I assume, for purposes of this ruling -- that it had no control

---

[34] As the issue of punitive damages involves questions of Rouse's subjective knowledge and intent, that issue, too, is best reserved for resolution in individualized damages hearings.

[35] My findings regarding qualified immunity also extend to defendant Doe.  The plaintiffs do not request summary judgment of their claims against Doe, however, so I do not here assess her liability for searches after June 25, 1997.

over the promulgation of the County policies proximately
responsible for the challenged searches.  Further, the record
before me does not suggest that any <u>City</u> employees had a practice
or custom of conducting such searches -- let alone a practice
sufficiently "well settled and widespread" as to be attributable
to the City.  <u>Bordanaro v. City of Everett</u>, 871 F.2d 1151, 1156
(1st Cir. 1989).  Finally, none of the challenged searches
resulted directly from the City's failure to promulgate a search
policy, <u>e.g.</u> <u>Cornfield v. Consolidated High School District No.</u>
<u>230</u>, 991 F.2d 1316 (7th Cir. 1993) ("[I]n situations that call
for procedures, rules, or regulations, the failure to make a
policy itself may be actionable"), nor from its failure to train
its employees regarding the constitutional prerequisites to a
search, <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388 - 90
(1988) ("[T]here are limited circumstances in which an allegation
of a 'failure to train' can be the basis for liability under §
1983").

      Nonetheless, the plaintiffs' claims against the City are
clearly actionable under § 1983.  The plaintiffs point to an
express agreement between the City and the County Sheriff, under
which the County agreed to "take custody of and house" BPD
arrestees at the Jail.  This case is thus best analyzed as
involving a subcontract between the City and the County, under

which Jail employees, acting as agents of the City, supervised and cared for City arrestees.[36]  As such, the City had an affirmative obligation -- as is present in the more standard models for municipal liability -- to ensure that the policy of the Jail officials did not lead to widespread violation of BPD arrestees' constitutional rights.  Ancata v. Prison Health Services, Inc., 769 F.2d 700, 705 n.9 (11th Cir. 1984) ("[W]here a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy").

A simple example is sufficient to prove this point.  Suppose the City had contracted with a private party to run a women's detention facility.  If the wardens at that facility followed a deliberate and explicit policy of starving or torturing the women in their care, the City clearly could not argue that it bore no responsibility for those abuses.  "In that sense, the [City's] duty [to detainees in its care] is non-delegable."  Id. at 705.  Similarly, here, "although the [County] . . . contracted to perform an obligation owed by the [City], the [City] itself

---

[36] I recognize that this would not be sufficient to support City liability under a theory of respondeat superior.  Board of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior." (internal citations omitted)).  Here, however, the question is City liability for promulgation and implementation of an express County policy, not City liability for the negligent acts of County employees acting as agents of the City.

remains liable for any constitutional deprivations caused by the policies or customs of the [County]."[37]  Id.[38]

Having established that the City had an affirmative obligation to monitor conditions for BPD arrestees housed at the Jail, I must next assess whether the City failed to meet that obligation.  In so doing, I find the "deliberate indifference" standard of City of Canton readily applicable.  489 U.S. at 388. As in that action, the alleged municipal misdeed here is not an affirmative policy but a "failure" -- the failure adequately to monitor the search policies followed by City agents employed at

---

[37] That the County is a public entity does not alter this analysis.  At least in the prison context, a private party that contracts to perform a public service is considered a "state actor" for purposes of § 1983 liability, so there is no reason to suppose that a municipality's constitutional obligations to its detainees are somehow more acceptably delegated to a public than a private entity.  E.g. West v. Atkins, 487 U.S. 42 (1988) (holding that for § 1983 purposes, a private physician under contract to provide medical services to inmates in a state prison system acted "under color of state law" when treating an inmate).  Thus, any entity, public or private, that takes on the city's obligations may be held liable as a state actor under § 1983, but the city, too, retains its oversight obligations.

[38] Accord Young v. City of Little Rock, 249 F.3d 730 (8th Cir. 2001).  The Young case involved a situation similar to that here, in which the City of Little Rock contracted with Pulaski County for the housing of city prisoners. The plaintiff in the case, Willie Mae Young, sought to hold the City accountable for her strip-search at the County jail.  The Eighth Circuit upheld the jury verdict for Young, reasoning as follows:

> Strip-searching of prisoners is routine procedure, and the jury could reasonably infer that the City knew that a person entering the [County] jail, in jail clothing with a group of other detainees, would be strip-searched.  In these circumstances, it is far from unfair to attribute to the City the policies routinely used by the County jail in the housing and processing of City prisoners.

Id. at 736.

the Jail, to ensure compliance with minimum constitutional standards. To establish liability, then, the plaintiffs must establish that the City's failure to monitor "amount[ed] to deliberate indifference to the rights" of BPD detainees. City of Canton, 489 U.S. at 388.

The plaintiffs easily meet this standard. Strip-searches at maximum security detention facilities are an unfortunate fact of life, yet the City chose to house almost ten thousand BPD arrestees in such a facility without once checking, even after the 1997 Swain decision, that the facility had a constitutional search policy -- let alone investigating the actual practices of Jail employees. For that matter, no City official apparently remarked on Jail personnel's surprising lack of curiosity about the precise nature of BPD booking searches. This lack of curiosity itself should have alerted City officials to the likelihood that the Jail followed a policy of routinely strip-searching all admittees rather than tailoring each search to the particular circumstances of an individual admittee's arrest. As this case sadly illustrates, the risks posed by the City's "glaring omissions" of oversight are concrete and obvious. Board of County Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397,

410 (1997). Those risks are more than sufficient to establish "deliberate indifference" as a matter of law.[39]  Id.

To excuse its failure to monitor the Jail's search policy and practice, the City cites Deaton v. Montgomery County, Ohio, 99 F.2d 885, 888 (6th Cir. 1993), for the proposition that it was entitled to assume that conditions at the Jail comported with constitutional standards. This argument might make some sense if the City had merely asked the County to house a few arrestees for a short period. Here, however, the City effectively used the County Jail as its own facility for almost a decade. To permit the City to escape liability in this case would be to sanction willful disregard of municipal obligations. The City presumably could have chosen to build a municipal facility for women, or to hold arrestees in one of the ten existing City police station lockups.[40] That it chose instead to contract with the County to house female arrestees did not entitle it to bury its head in the sand and ignore the manner in which the County treated those

---

[39] As further evidence of the City's deliberate indifference to the constitutional rights of its arrestees, the plaintiffs note that the City failed to adopt its own policy on the issue of strip-searches until September 1998, midway through the class period. Though regrettable, that omission is not directly relevant here. Even if the City had promulgated an explicit policy regarding strip-searches, the policy would not necessarily have protected female BPD arrestees from strip-searches at the Jail; the absence of such a policy is neither necessary nor sufficient to prove "deliberate indifference" to conditions at the Jail.

[40] In fact, this is what the City now proposes to do. City's Letter to the Court of June 6, 2001 [docket entry # 114].

-42-

arrestees.   Governmental entities may not "slough off their

responsibilit[ies]" by performing "a 'shell game' with the legal

ownership of prisons."  <u>Deaton v. Montgomery County, Ohio</u>, 989

F.2d 885, 890 (6th Cir. 1993) (Boggs, J., concurring).

Under these circumstances, there can be no question that the

City's liability in damages for Jail violations of BPD arrestees'

Fourth Amendment rights is coextensive with that of the County.

Accordingly, the plaintiffs' request for summary judgment of City

liability is **GRANTED in part**.  The City is liable in damages for

the unconstitutional searches of women in Sub-Class I throughout

the class period.  The City's liability for the searches of women

in Sub-Class II remains to be determined.

### 4.    The City's Liability for Equal Protection Violations

Finally, I turn to the plaintiffs' claim that the City

denied female arrestees the equal protection of the laws.  As (1)

there can be no question that explicit City policy mandated that

the women be sent to the Jail, and (2) I have already concluded

that the City can be held liable under § 1983 for subsequent

Fourth Amendment violations at the Jail, the only issue that must

be addressed to determine City liability on the plaintiffs' equal

protection claim is whether the City policy, and the resulting

searches, violate the Equal Protection Clause of the Fourteenth

Amendment.

The City's policy of sending women to the County Jail
resulted in a clear and significant gender disparity in the
treatment of BPD arrestees.  Both male and female arrestees were
searched incident to booking, but only female arrestees were
routinely subjected to degrading strip and visual body cavity
searches thereafter.  To satisfy the requirements of the Equal
Protection Clause, the City would have to show that it had "an
'exceedingly persuasive justification' for [this] differing
treatment."  Mary Beth G., 723 F.3d at 1273 (citing Mississippi
University for Women v. Hogan, 458 U.S. 718, 724 (1982)).

> [This] burden of justification is demanding and it
> rests entirely on the [City]. . . .  The [City] must
> show 'at least that the [challenged] classification
> serves 'important governmental objectives and that the
> discriminatory means employed' are 'substantially
> related to the achievement of those objectives.'  The
> justification . . . must not rely on overbroad
> generalizations about the different talents,
> capacities, or preferences of males and females.

United States v. Virginia, 518 U.S. 515, 533 (1996).

The City fails to carry this burden.  It explains its
decision to house female arrestees at the County Jail by
referring briefly to "the need to ensure the security, safety and
health of the female prisoners, which could not adequately be
fulfilled at the [BPD] area station houses."  It indicates that
"[p]olice district cells could not hold women, because they were
not configured to separate women from men," and it argues "the

department did not have the personnel and resources to administer holding cells for women."

These conclusory statements do little more than recast the City's original decision to discriminate in less offensive terms. To satisfy the strictures of the equal protection jurisprudence outlined above, the City would have to explain _why_ it could find no satisfactory space for women in the BPD station houses, and _why_ it felt its personnel and resources were better used to meet the needs of male rather than female arrestees.[41]  Vague and general references to funding and space constraints cannot justify a policy that resulted directly in the strip and visual body cavity searches of thousands of female arrestees, while permitting their male counterparts to rest in the relative comfort and security of BPD lockups.  An explicit City policy of searching female but not male BPD arrestees would clearly violate the Equal Protection Clause.  E.g., Mary Beth G., 723 F.2d at 1273 - 74.  The policy at issue here is an improvement in name only.

Thus, I find the City liable in damages for the violation of the equal protection rights of _all_ women in the plaintiff class, regardless of the crimes with which they were charged, or the

---

[41] For example, cells in one of the existing station houses could have been devoted to female arrestees, as the City now proposes to do.  Id.

sub-class in which they fall for the Fourth Amendment analysis. The amount of damages remains to be determined.

IV. **CONCLUSION**

As detailed above, the plaintiffs' motion for summary judgment is **ALLOWED in part and DENIED in part**. The County defendants' motion for summary judgment is **DENIED**.

The plaintiffs are **ORDERED** to name a representative for Sub-Class II -- or alternatively, to propose further subdivision of that class -- by **August 15, 2001**. The defendants' response is due within fifteen days thereafter.

**SO ORDERED.**

**Dated:   July 31, 2001**

NANCY GERTNER, U.S.D.J.

-46-