UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROWNWYN FORD, KATRINA )
MACK, et al., on behalf of themselves )
and on behalf of others similarly situated, )
Plaintiffs )
)
v. )    Civil Action No. 98-11346-NG
)
SUFFOLK COUNTY, RICHARD J. )
ROUSE in his individual capacity, )
JANE DOE, in her individual capacity, )
and the CITY OF BOSTON, )
Defendants )

**PLAINTIFFS' REPLY TO
DEFENDANT CITY OF BOSTON'S OPPOSITION TO
PLAINTIFF'S SUMMARY JUDGMENT**

## I.    INTRODUCTION

Plaintiffs seek summary judgment against the City of Boston ("City") on three

separate claims of liability: one under the Equal Protection clause of the Fourteenth

Amendment and two under Monell.[1]  Plaintiffs allege the following: (1) the City's policy

of holding men overnight in police lockups but sending only women to the Nashua

Street Jail ("Jail") violated plaintiffs' right to equal protection; (2) the Suffolk County's

("County") strip search policy was also the policy of the City's; and (3) the City had a

custom or practice of deliberate indifference to the Fourth Amendment rights of pre-

arraignment detainees which resulted in the illegal strip searches of the plaintiffs at Jail.

---

[1] Monell v. Department of Social Services, 436 U.S. 658 (1979).



In their opposition, the City does not contest any of the facts in plaintiff's motion for summary judgment - therefore, all of the facts are to be taken as true. As explained below, the plaintiffs are entitled to summary judgment.

## II.    ARGUMENT

### A.    The City Did Not Have an Exceedingly Persuasive Justification for Transporting its Female Arrestees to the Jail

In response to plaintiffs' equal protection claim, the City agrees that it must show an "exceedingly persuasive justification" for the City's classification of the plaintiffs based on sex but argues that it had such justification for the different treatment of its female arrestees.[2]  The burden is met "only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'"[3]  "The burden of justification is demanding and it rests entirely on the [City]."[4]  "The justification must be genuine, not hypothesized or invented post hoc in response to litigation."[5]

The City argues that after the old House of Detention in Pemberton Square closed on March 13, 1991, Boston Police Department ("BPD") district stations could not hold women because they were not configured to separate men from women.  Even if true, this

---

[2] City's SJ Opp. p. 6.  See, United States v. Virginia, 518 U.S. 515, 530 (1996).

[3] Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)(quoting Wengler v. Druggists Mutual Insurance Co., 446 U.S. 142 (1980).

[4] United States v. Virginia, 518 U.S. at 533.

[5] Id.

was a dilemma the City created which the city could have easily prevented. The City could have continued using the House of Detention.[6] If the City felt that its police stations were not "configured"properly, it should not have agreed to transfer control of the House of Detention to the County.

Some BPD police stations had separations where women could be held separately from men.[7] Or, as BPD Commissioner Paul Evans acknowledged, the City could have used one police district station as a "central detention facility for women."[8] Either alternative would have solved all the concerns. The City does not dispute the fact that it could have lodged all of its female arrestees ninety-nine percent of the time if it had assigned just eleven percent of its lockup space for that purpose. The City had one hundred and sixteen lockup cells until October 1996 when a new police station was built adding ten more cells.[9] It also built a new Headquarters building in October 1997 in Schroeder Plaza.[10] When it built these new facilities, the City chose not to build a female detention area. The City admits it did not use any of its cells to house its female arrestees overnight.[11] After agreeing to send its women to the Jail, the City forgot about them.

---

[6] Plaintiffs' Ex. 9 at 19/22-20/4.

[7] Plaintiffs' Ex. 8, MJJ Aff. Ex. A, BPD Cell Map (For example, BPD stations A-7, D-4 and D-14 had lockups cells in two rows back to back).

[8] Plaintiffs' Ex. 9 at 19/22-20/4.

[9] Plaintiffs' Ex. 8 at ¶11.

[10] Plaintiffs' Ex. 8, MJJ Aff. Ex. A, BPD Cell Map.

[11] Plaintiffs' Ex. 10 at req. 5.

The Nashua Street Jail is "a maximum security facility that was never designed or intended to hold women awaiting arraignment."[12]  The City knew that the "Nashua Street Jail is a state-of-the-art jail, more secure than any of the Boston Police Department's own facilities."[13]  The City knew or should have known of the danger that pre-arraignment women it sent to the Jail would be treated differently from men held in police lockups.  As the County points out, DOC regulations permitted routine strip searches of prisoners in county jails.[14]  Because the City cannot show an "exceedingly persuasive justification" for transporting its female arrestees to the Jail, it violated the plaintiffs' right to equal protection.

**B.    The County's Policy Was Also the City's Policy**

The City had a written policy of transporting only women to the Jail and a policy, practice or custom of using the Jail as its overnight holding facility for its female arrestees where they were subjected to a strip search upon admission to the Jail pursuant to County policy.  The class members were City prisoners lodged at the Jail.[15]  The City cannot escape liability by simply stating "the City's final policymakers adopted a policy of transporting women to the Suffolk County Jail.  It is there that the City's policies end, and the County's policies began."[16]

---

[12]  Plaintiffs' Ex.2 at 37/15-22.

[13]  City's SJ Opp p.2.

[14]  County's SJ Cross motion p. 4.

[15]  Plaintiffs' Ex. 7 at 60/1-10.

[16]  City's SJ Opp at p. 11.

In Bovey v. City of Lafayette, the City of Lafayette used the Tippecanoe County Jail for long-term holding cells for its arrestees.[17] The Bovey court found that the City's policy, practice or custom of usage of the Jail was in and of itself " clearly a practice, custom, policy and usage as outlined in Monell . . . even though the Sheriff, an elected state and county official, has the basic legal responsibility for operating the Jail."[18] The court concluded that the "custom, practice, policy, and usage by the City result[ed] in this strip search."[19] The court in O'Brien v. Borough of Woodbury Heights came to the same conclusion when "the Borough had a policy, at the time plaintiffs were arrested, of bringing arrestees to the Gloucester County Jail".[20] The court stated that "it is not necessary to prove that the official policy itself is unconstitutional. Monell requires only that the official policy cause the constitutional violation."[21] The same is true in this case. The City had a policy, practice and custom of using the Jail as its overnight holding facility for its female arrestees. This policy was the moving force of the strip searches of the plaintiffs. The County's strip search policy was also the City's policy.

---

[17] 586 F. Supp. 1460, 1472 (N.D.Ind. 1984), aff'd, 774 F.2d 1166 (7th Cir. 1985).

[18] 586 F. Supp.at 1472.

[19] Id. at 1473.

[20] 679 F.Supp. 429, 435 (D.N.J. 1988).

[21] Id., citing, Sabo v. O'Bannon 586 F. Supp. 1132, 1143 (E.D. Pa. 1984).

C.    **Deaton v. Montgomery County, Ohio Does Not Apply to the Facts of This Case**

The City argues that it could reasonably assume that the County policy was constitutional relying on Deaton. Both entities in Deaton had responsibility for holding pre-arraignment detainees. Here, only the City had that responsibility. Deaton does not apply for many reasons.[22]

First, in Deaton, an Ohio statute explicitly permitted the county to enter into an agreement with a municipality in carrying out its duty to maintain jails facilities.[23] Here, Massachusetts did not confer such authority for allowing the City to enter into an agreement with the County. The responsibility for holding its arrestees remained with the City[24]. The City of Dayton and Montgomery County conformed with state law in Deaton. By entering into the agreement with Suffolk County, the City of Boston violated Massachusetts state law.[25]

---

[22] If the facts were similar, the concurring opinion suggests that the Sixth Circuit would have decided that Montgomery County was liable for the City of Dayton's strip search policy. See, 989 F.2d at 891 ("Montgomery County cannot be not liable, **under the facts of this case**, for availing itself of the opportunity in Ohio to contract for shared jail space. This opinion does not enable authorities to slough off their responsibility or perform a 'shell game' with the legal ownership of prisons. Montgomery County certainly could be held liable to the extent that it had knowledge about or direction of the policies being carried out by the city under its contract, or to the extent that it was deliberately indifferent to what those policies were.") (emphasis in bold original; underline added).

[23] 989 F.2d at 887 (citing Ohio Revised Code § 307.15).

[24] M.G.L. c.126 Sec. 4. The City could only send its pre-arraignment arrestees to a jail if there are no adequate lockup cells available. The City sent its female arrestees to the Jail without regard to availability of its lockup cells.

[25] The Deaton court noted that "the County was in accordance with Ohio law and the agreement between the two governmental entities is valid." 989 F.2d at 887.

Second, in <u>Deaton</u>, both a city and a county had authority under Ohio state law "to establish, erect, maintain and regulate jails".[26]  In Massachusetts, only the counties have been given the authority to establish, erect, maintain and regulate jails.  Cities are not authorized to run jails.

Third, in <u>Deaton</u>, Ohio had a state law governing the standard for strip searches which applied equally to the City of Dayton and Montgomery County.[27]  The City of Boston admits that, unlike in <u>Deaton</u>, "there is no Massachusetts Legislative law governing strip and visual body cavity searches."[28]  Therefore, unlike in <u>Deaton</u>, the City and the County had different standards governing strip searches --- strip searches of pre-arraignment detainees for the City and strip searches of pre-trial and convicted inmates for the County.  As the County points out, the Nashua Street Jail is a maximum security facility which was not intended to hold pre-arraignment detainees.[29]  Regulations for county correctional facilities cited by the County permitted routine strip searches at county correctional facilities.  The City had notice that the typical policy at a jail would

---

[26]<u>Deaton</u>, 989 F.2d at 887 (citing Ohio Revised Code § 307.01(A) which authorizes a county to maintain jail facilities and Ohio Revised Code § 715.16 which authorizes cities to maintain jail facilities).

[27] Id. at 887 (citing Ohio Revised Code § 2933.32).  The court observed that "[<u>Deaton</u>] deals with another governmental entity governed by the same laws as the County." Id at 890.

[28] City's SJ Opp. at p. 10.

[29] The City states it is an undisputed fact that the "Nashua Street Jail is a state-of-the-art jail, more secure than any of the Boston Police Department's own facilities."  City SJ Opp. p.2.

be to strip everyone. The City could not reasonably assume that the strip search policies at the Jail were constitutional for pre-arraignment detainees.

Fourth, in <u>Deaton</u>, the County had a valid strip search policy and therefore could assume that the City of Dayton also had a valid strip search policy. The City of Boston did not provide written guidelines to its police officers on the topic of strip searches until September 1998 when Evans issued his memorandum. The City had no reason to assume the County was following the law when the City itself did not have a policy that conformed to the law. The City was itself deliberately indifferent to the subject of strip searches for most of the class period. State police and small towns had constitutional strip search policies long before the class period began on December 10, 1995. North Reading, a town with a population of 11,980[30] had a valid policy since 1989.[31] Marlborough, a city with a population of 31,833[32] had one since at least February 15, 1990.[33] Massachusetts State Police had a valid policy from at least December 1, 1992.[34] The Municipal Police Institute Manual provision on strip searches, which <u>Swain</u> held

---

[30] 1990 U.S. Census Bureau Report.

[31] See, <u>Swain v. Spinney</u>, 117 F.3d 1, 4 (1st Cir. 1997).

[32] 1990 U.S. Census Bureau Report.

[33] HF Aff. at ¶¶8, 9, HF Aff. Ex. C.

[34] HF Aff. at ¶¶8, 10, HF Aff. Ex. D.

was constitutional,[35] had been in place since 1992.[36]  The City of Boston, with a population of 574,289[37] has the largest municipal police force in the state.  If its policymakers paid any attention to the issue, it too would have had a proper strip search policy years before December 10, 1995.

Lastly, unlike the case in <u>Deaton</u>, the Mayor and city councilors of Boston were the county commissioners for Suffolk.  As the executive officers of both the City and the County, they should have known of the County's unlawful policy.  In <u>Deaton</u>, the court stated that "[t]here are no facts presented indicating that the sheriff knew or should have known that strip searches were conducted in violation of state law."[38]

### D.    The City Was Deliberately Indifferent

In response to plaintiffs' deliberate indifference claim, the City argues (1) it did not know of the County's illegal strip search policy, (2) it could reasonably assume the County policy was constitutional and (3) even if the City knew of the County's illegal policy, it did not have any power or authority to change it.  The City argues, and the plaintiffs agree, that the strip search policy at the Jail was the Sheriff's policy and the County should be held accountable.  Plaintiffs will address each of the City's arguments to show why the City should also be held liable.

---

[35] <u>Swain</u>, 117 F.3d at 9.

[36] HF Aff. at ¶¶8, 11, HF Aff. Ex. E.

[37] 1990 U.S. Census Bureau Report.

[38] <u>Deaton</u> at 889-890.

1.   **The City Knew of the County's Illegal Strip Search Policy**

Plaintiffs do not make the same claim that the City is liable for acts of the County as the plaintiff in Correia.  The City was on notice of the County's strip search policy because they shared executive officers and due to their obligations as the county commissioners.  As county commissioners of Suffolk County, the mayor and city council of Boston are charged with the knowledge of Suffolk County's illegal strip search policy.

Furthermore, the strip search policy and practice was so widespread that the City should have known about it.  Before the class period began, since 1991, the City sent more than 10,000 of its female arrestees to the Jail.[39]  During the class period from December 10, 1995 through September 20, 1999, the City sent 8,109 female arrestees to the Jail.[40]  Every woman the City sent to the Jail was to be strip searched pursuant to an ironclad policy.  The strip searches at the Jail were not isolated or random occurrences - they took place almost every day for more than eight years until the County revised its policy in May 1999.

Even if the City did not have actual or constructive knowledge of the County's strip search policy, it is liable because it was deliberately indifferent to what that policy was.[41]  Boston Police Commissioner Paul Evans negotiated the agreement with the

---

[39] Plaintiffs' Ex. 31 at ints. 1 and 8.

[40] Plaintiffs' Ex. 8 at ¶7.

[41] Deaton, 989 F.2d at 889-890 ("There are no facts presented indicating that the Sheriff knew or should have known that strip searches were conducted in violation of law.")

County.[42]  He knew that the County would conduct some type of search of the women

the City sent to the Jail.[43]  Evans knew it would be a good practice for the policy to be in

writing and assumed the County had one.[44]  The County had a written policy requiring

strip searches on admission to the Jail when Evans negotiated the agreement with the

County.[45]  The Jail's policy is a public record under M.G.L. ch. 4 §7.  Evans never

bothered to learn what the County's policy was.[46]  As explained above, the City could not

reasonably assume that the County policy was constitutional.  The City correctly notes

that "even if a supervisor lacks actual knowledge of censurable conduct, he may be liable

for the foreseeable consequences of such conduct if he would have known of it but for his

deliberate indifference or wilful blindness."[47]  That was the case here.

### 2.  After the City Knew That the County Was Illegally Strip Searching Women Held for the City, the City Continued to Ignore the Problem

The City had actual knowledge that the women it sent to be lodged at the jail

were routinely strip searched when it was notified of this lawsuit which was filed on

December 10, 1998.  After it indisputably had knowledge, the City continued to ignore

---

[42] Plaintiffs' Ex. 9 at 20/24-22/8; 30/14-15.

[43] Id. at 24/18-23; 25/8-17.

[44] Id. at 25/18-26/1.

[45] Plaintiffs' Ex. 31 at int. 2; Ex. 36.

[46] Plaintiffs' Ex. 9 at 9/6-9; 25/14-17.

[47] City's SJ Opp. p. 14, citing Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1991).

its female detainees. The City kept sending women to the Jail knowing that every woman would be unconstitutionally strip searched up to May 24, 1999 and knowing that those women charged with felonies would be illegally strip searched until September 29, 1999. This shows deliberate indifference. The Commissioner's memorandum establishes that the City knew that under Swain, these searches violated the Constitution because the County's policy did not comply with the law.[48]

The City's failure to take any steps to stop the continuing violation of the constitutional rights of its female detainees after it knew they were being illegally strip searched shows that the City of Boston was deliberately indifferent to the constitutional rights of female detainees not only after this suit was filed, it also shows deliberate indifference throughout the class period. The First Circuit has held that "actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident."[49]

### 3.    The City Had Power to Stop the Unconstitutional Strip Searches

The City notes that "even if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would

---

[48] Plaintiffs' Ex. 12.

[49] Foley v. City of Lowell, 948 F.2d 10, 14-15 (1st Cir. 1991)(upholding the district court's conclusion "that the [subsequent] incident was competent, if indirect, evidence of a preexisting municipal policy of indifference"). See also, Bordanaro v. McLeod, 871 F.2d 1151, 1167 (1st Cir. 1989)("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"); see also Fed. R. Evid. 401 (evidence is relevant so long as it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

have known of it but for his deliberate indifference or wilful blindness, and if he had the power and authority to alleviate it."[50]  The City argues that "power and authority to alleviate it" means power and authority to change the policies of the Suffolk County Sheriff.[51]  While the City had "no authority or control over the jail by which it could order any change in policies,"[52] it had the power to stop sending its female arrestees to the Jail.  It could have set up a holding facility for women that was not within a maximum security jail.  As explained above, the City did not have to send women to the Jail. This would have ended the unconstitutional strip searches the class members suffered.

The City is correct when it states that a municipality is liable under §1983 if "a deliberate choice to follow a course of action is made among various alternatives by the official . . .responsible for establishing final policy with respect to the subject matter in question."[53]  That is what the City did.  As explained above, the City could have followed several different options including keeping the House of Detention open, holding women in cells that are physically separated from male cells, designating one police district station as a "central detention facility for women" or building a female holding area when it built new facilities.

---

[50] City's SJ Opp. p. 14, citing Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1991).

[51] Id.

[52] The City could have ordered a change in the County's policy.  BPD Commissioner Evans could have said that unless the County stopped conducting the strip searches, he would stop sending BPD female arrestees to the jail.  The City could have refused to approve the County's budget unless the County ended the strip search policy.

[53] City SJ Opp. p. 12, citing Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

The City is liable for all "the foreseeable consequences" of sending its female arrestees to the Jail.[54] The City's policy of sending its female arrestees to the Jail and the fact that the City knew or should have know of the County's strip search policy and practice is establishes causal nexus to the plaintiffs' injuries. The City's deliberate indifference to the Fourth Amendment rights of female prisoners provides additional support for its liability.

### E.    U.S. v. Klein Was Not Good Law

If all of its arguments fail, the City argues that United States v. Klein[55] was good law until June 25, 1997 when the First Circuit decided Swain v. Spinney.[56] This is wrong[57] but it does not matter as to both the City and the County as they are municipalities. A municipality is not entitled to qualified immunity and is liable under §1983 "when it officially adopts a policy that subsequently is decided unconstitutional."[58]

---

[54] See, Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1991).

[55] 522 F.2d 296 (1st Cir. 1975).

[56] 117 F.3d 1 (1st Cir. 1997). Both the City and County refer to this decision as "Swain II" and the district court decision, 932 F.Supp. 25 (D.Mass. 1996), as "Swain I." This is incorrect. Designation of "I" and "II" only applies if the same Circuit Court of Appeals decide the case twice.

[57] Reliance on a district court opinion which had been reversed is improper. The City admits that the First Circuit in Swain found "that Klein was abrogated by subsequent Supreme Court and First Circuit cases, as well as by other circuit courts that considered the issue." City SJ Opp. at 14 (emphasis added). Swain held that, notwithstanding Klein, the Fourth Amendment right to be free from unreasonable search has been "celarly established" since 1977 in this Circuit. 117 F.3d at 9. As early as 1988, a court had noted that "[i]n evaluating the permissibility of body cavity or strip searches of arrestees, seven of the United States Circuit Courts of Appeals have held that such searches must be based on a 'reasonable suspicion' that an arrestee is concealing contraband or weapons. O'Brien v. Borough of Woodbury Heights, 679 F.Supp. 429, 433 (D.N.J. 1988). The defendants in O'Brien "contend[ed], in the face of this overwhelming contrary authority, that the blanket strip/body cavity search policy of the Gloucester County Jail is a necessary and constitutional procedure." Id. at 433 (emphasis added). More than a decade later, the City and the County makes the same argument which the O'Brien court rejected.

[58] Davis v. City of Camden, 657 F.Supp. 396 (D.N.J. 1987).

## III.    <u>CONCLUSION</u>

This court should enter a summary judgment establishing the liability of defendant City of Boston to the named plaintiffs and the class they represent.

RESPECTFULLY SUBMITTED,
The plaintiffs, individually and on
behalf of all others similarly situated,
By their attorneys,

Howard Friedman
BBO #180080

Myong J. Joun
BBO #645099
Law Offices of Howard Friedman
90 Canal Street, Fifth floor
Boston, MA 02114-2022
(617) 742-4100